**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 12-408-02** |
| | : | |
| **DEBORAH PEARL ELEAZER** | : | |

**MEMORANDUM OPINION**

**Savage, J.**                                                                                     **March 28, 2014**

Pursuant to a plea agreement containing an appellate waiver provision, the defendant, Deborah Pearl Eleazer, pleaded guilty to conspiracy to distribute oxycodone. One month after she was sentenced to a one-year prison term, Eleazer filed a motion under 28 U.S.C. § 2255. She contends that her attorney was ineffective because he persuaded her to plead guilty despite her innocence and failed to conduct a reasonable pretrial investigation.[1] She also argues that her sentence was "based on inaccurate information and false assumptions" that her attorney failed to correct.[2] She boldly asserts that "the sentence would have been probation or something lower than one year in jail" had the court been aware of her addiction.[3] In essence, her motion seeks to withdraw her guilty plea.

The government seeks dismissal of the motion because the defendant waived her right to collaterally attack her sentence under 28 U.S.C. § 2255.[4] In the alternative,

---

[1] Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Mot."), 12-cr-408-2 (Doc. No. 45) at 6.

[2] *Id.* at 7.

[3] *Id.*

[4] U.S. Opp. to Def.'s Mot. Pet. under 28 U.S.C. § 2255 (Doc. No. 52) at 1.

the government argues that her claims lack merit.[5]   It contends that any confusion regarding the possible penalty or the factual basis for the guilty plea was clarified during the guilty plea colloquy.[6] It also argues that counsel did make arguments at the defendant's sentencing that she claims were not made.[7]   It emphatically protests her claim of innocence.

Having presided over the defendant's guilty plea colloquy and sentencing hearing, and after carefully reviewing her motion and holding an evidentiary hearing, I conclude that she knowingly and voluntarily waived her right to file a direct appeal, but not her right to collaterally attack her sentence.   Nevertheless, considering Eleazer's § 2255 motion on the merits, I find her claims are meritless.   Therefore, I shall deny the motion.

## Background

Eleazer was charged with conspiracy to distribute oxycodone in violation of 21 U.S.C. § 146.   On December 20, 2012, she pleaded guilty.   Her plea agreement contained a waiver of appellate rights.   She reserved the right to appeal only if the government appealed, her sentence exceeded the statutory maximum, her sentence resulted from an erroneous upward departure from the sentencing guideline range, or her sentence was unreasonably above the applicable guideline range.   The waiver included the right to pursue a collateral attack via a motion to vacate, set aside or modify her sentence pursuant to 28 U.S.C. § 2255.

---

[5] *Id.*

[6] *Id.* at 11-12.

[7] *Id.* at 12-13.

On March 20, 2013, Eleazer was sentenced to twelve months imprisonment to be followed by three years of supervised release.  Five days after she was sentenced, notwithstanding the appellate waiver in her plea agreement, Eleazer filed a *pro se* notice of appeal to the Third Circuit Court of Appeals.  In response, the government filed a motion to enforce the appellate waiver.  While the appeal was pending, Eleazer filed her § 2255 motion in this court.  On May 13, 2013, the Third Circuit granted Eleazer's motion to withdraw her appeal.

An evidentiary hearing was held on May 1, 2013.  Eleazer and her former attorney testified.[8]  Eleazer testified that her counsel suggested that she plead guilty even though she was not guilty of the charges.[9]  She asserted that she did not understand the guilty plea agreement, citing her having been in a "special class" in school.[10]  She also testified that she did not understand her counsel's explanations of the indictment or the court's questions at the change of plea hearing.[11]

Eleazer's former attorney testified that Eleazer never told him that she had been in special education classes or that she could not read.[12]  He noticed no "evidence of mental retardation."[13]  He explained that he reviewed the plea agreement with Eleazer and she appeared to understand it.[14]  He vehemently denied telling her that she would

---

[8] Eleazer's brother, sister and the DEA agent also testified.

[9] May 1, 2013 § 2255 Hr'g Tr. Eleazer Testimony 6:17-7:3.

[10] *Id.* 8:10-23; 3:24-4:8.

[11] *Id.* 14:23-16:3.

[12] May 1, 2013 § 2255 Hr'g Tr. Counsel Testimony 10:25-11:12; 20:14-19.

[13] *Id.* 11:7-9.

[14] *Id.* 7:8-10; 8:4-9.

receive a sentence of probation if she pleaded guilty.[15]   Although he said he recommended a guilty plea,[16] he denied pressuring her to plead guilty.[17]

### Appellate Waiver

An appellate waiver is valid and enforceable if entered knowingly and voluntarily, and enforcing it will not work a miscarriage of justice.  *United States v. Goodson,* 544 F.3d 529, 536 (3d Cir. 2008) (citation omitted)*; United States v. Khattak*, 273 F.3d 557, 558 (3d Cir. 2001).   A waiver of appeal includes relinquishing "the opportunity to challenge the sentence imposed, regardless of the merits."  *Khattak*, 273 F.3d at 561.

As a threshold matter, the court must determine whether the issue raised by the defendant falls within the scope of the waiver.  *United States v. Wilson*, 707 F.3d 412, 414 (3d Cir. 2013) (citation omitted).   If it does, the court then considers whether the defendant knowingly and voluntarily agreed to the waiver.  *Id.*  If it finds that she did, the court asks whether enforcing the waiver will result in a miscarriage of justice.  *Id.*

Eleazer challenges her guilty plea and sentence.  She contends that her counsel was ineffective when he induced her to plead guilty to a crime she did not commit and did not explain her rights to her.[18]   Further, she asserts he advised her to plead guilty without having all the information available to him necessary to make an informed decision.[19]

---

[15] *Id.* 9:23-10:14; 26:3-6.

[16] *Id.* 22:4-6.

[17] *Id.* 25:1-13.

[18] § 2255 Mot. Decl. (Doc. No. 45-2) ¶¶ 3-4; Mem. in Supp. of § 2255 Mot. (Doc. No. 45-3) at 9-10.

[19] § 2255 Mot. Decl. ¶ 5; Mem. in Supp. of § 2255 Mot. at 9-10.

Eleazer also claims that her total offense level at sentencing was calculated on an incorrect loss amount.[20]  The plea agreement provided that "the defendant . . . waives all rights to appeal or collaterally attack the defendant's . . . sentence . . . ."[21] Therefore, this claim falls within the scope of the waiver.

At the next step in assessing the validity of the waiver, the court considers the language of the waiver and the guilty plea colloquy.  *United States v. Mabry*, 536 F.3d 231, 238 (3d Cir. 2008).  To ensure that an appellate waiver is knowing and voluntary, the defendant must be informed of the plea agreement provision waiving the right to appeal and to collaterally attack her sentence.  *Id.* at 238-39.  The court must be certain that the defendant understands what she is waiving.  *See Khattak,* 273 F.3d at 560, 563.

At her guilty plea hearing, the defendant was advised of her appellate rights and her right to collaterally attack her conviction and sentence by a § 2255 motion.[22]  She acknowledged that she had those rights and was relinquishing them.[23]  She confirmed that her decision to plead guilty was voluntary and she was pleading guilty of her own free will.[24]  She also stated that she was satisfied with her attorney's representation.[25] At no time during the guilty plea colloquy did she exhibit any reluctance to go forward or

---

[20] Mem. in Supp. of § 2255 Mot. at 10.

[21] Guilty Plea Agreement (Doc. No. 26) ¶ 9.

[22] Dec. 20, 2012 Change of Plea Hr'g Tr. 23:7-23.

[23] *Id.*

[24] *Id.* 10:21-11:3.

[25] *Id.* 10:17-20.

a lack of understanding of what she was giving up by pleading guilty.  In fact, she vehemently insisted that she did not want to go to trial.[26]

Prior to accepting the plea, I found that Eleazer's willingness to enter a guilty plea was voluntary and she had a full understanding of her right to go to trial.[27]  After she entered her guilty plea and before I adjudged her guilty, the defendant did not have any questions about what had transpired at the hearing.[28]

The language of Eleazer's agreement was clear and unambiguous as to her direct appeal rights.[29]  It clearly spelled out the limited circumstances, none of which are present here, where a direct appeal could be taken.[30]

The language of the waiver provision relating to a collateral attack, on the other hand, is not clear.  The waiver provision reads as follows:

> In exchange for the undertakings made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.[31]

At her change of plea hearing, Eleazer was advised regarding a § 2255 waiver as follows:

> In addition to giving up your rights to take a direct appeal to the 3rd Circuit Court of Appeals[,] you are also giving up your right to file a petition under 28 United States Code, Section 2255 to modify, set aside your conviction

---

[26] *Id.* 30:21-25.

[27] *Id.* 34:1-16.

[28] *Id.* 35:23-25.

[29] *See* Guilty Plea Agreement ¶ 9.

[30] *Id.*

[31] *Id.*

or anything to do with these proceedings.    In other words, you have nowhere to go after you are sentenced.  You got that?[32]

Eleazer responded that she understood what that meant.[33]  Nonetheless, in her motion, Eleazer contends that she did not fully comprehend the meaning and consequences of pleading guilty generally and of waiving her appellate rights specifically.[34]  She contends that her counsel never explained the consequences of entering the plea with the waiver provision in it.[35]  Significantly, her former counsel testified that he did not recall going over the implications of a waiver of a right to file a motion under § 2255.[36]

One cannot conclude confidently that Eleazer comprehended what she was giving up by agreeing to the waiver as it related to a § 2255 motion.  She was given the typical advice about giving up her right to file a § 2255 motion.  Although she appeared to understand the plea agreement generally and the direct appeal waiver, I do not find that she knew and fully understood what a § 2255 motion was and that she was giving up the right to file one.  The warning is unclear and almost incomprehensible to anyone other than federal criminal law practitioners.

Considering the language of the § 2255 waiver in the plea agreement and the advice given at the plea colloquy together with Eleazer's former counsel's testimony that he did not recall advising her of her right to file a § 2255 motion and the consequences

---

[32] Dec. 20, 2012 Change of Plea Hr'g Tr. 23:14-20.

[33] Id. 23:21-23.

[34] § 2255 Mot. Decl. ¶ 4.

[35] Id.; Mem. in Supp. of § 2255 Mot. at 10.

[36] May 1, 2013 § 2255 Hr'g Tr. Counsel Testimony 9:10-15.

of giving it up, I find that she did not knowingly waive her right to file a motion pursuant to 28 U.S.C. § 2255.

It is not necessary to address the miscarriage of justice prong. In any event, whether enforcing the waiver will result in a miscarriage of justice is intertwined with Eleazer's claims. Therefore, having concluded that Eleazer did not knowingly waive her right to file a § 2255 motion, I shall consider her claims on the merits.

### Ineffectiveness of Counsel

Where the defendant claims that the waiver itself was the result of counsel's ineffectiveness, the appellate waiver will not preclude the filing of a motion under 28 U.S.C. § 2255. *United States v. White*, 307 F.3d 336, 337 (5th Cir. 2002) ("[I]neffective assistance of counsel claims only survive a waiver of appeal if they directly relate to the voluntariness of the waiver. . . ."); *United States v. Craig*, 985 F.2d 175, 178 (4th Cir. 1993) (permitting a petitioner's claim to continue where the motion to withdraw a guilty plea "incorporate[d] a claim that the waiver of appeal as well as the guilty plea itself was tainted by his counsel's ineffectiveness . . . ."); *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001) (finding that ineffective representation claims survive waiver only where they directly challenge the validity of the plea). In other words, the only ineffectiveness claim that a defendant who has executed a waiver can bring is one that her attorney was ineffective in negotiating the plea agreement containing the waiver. All other ineffectiveness contentions are precluded by the waiver.

Ineffective assistance of counsel claims are evaluated under the familiar two-part standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009). First, the petitioner must demonstrate that her

attorney's performance was deficient, that is, "counsel's representation fell below an objective standard of reasonableness," considering all of the surrounding circumstances of the particular case and the facts viewed at the time of counsel's conduct. *Strickland*, 466 U.S. at 687-89. Second, if there was deficient performance, the petitioner must show that it prejudiced her defense. *Id.* at 691-92. The prejudice prong requires a showing that as a result of the deficient representation, a reasonable probability exists that the results of the proceedings would have been different. *Id.* at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* In other words, the prejudice component focuses on whether counsel's deficient performance renders the result of the proceedings unreliable or the proceeding fundamentally unfair. *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000).

Counsel's performance is deficient only where the petitioner can show that counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Where counsel's conduct falls within the wide range of reasonable professional assistance under the circumstances, it is presumed to be sound strategy. *Id.* at 689.

The performance analysis starts with the presumption that counsel's conduct was part of a sound strategy. This "weak" presumption can be rebutted by showing either that the conduct was not part of a strategy or was part of an unsound strategy. *Thomas v. Varner*, 428 F.3d 491, 499-500 (3d Cir. 2005). Where the record does not explicitly reveal trial counsel's actual strategy or the lack of one, the presumption may be rebutted only by a showing that no sound strategy could have supported the conduct. *Id.* at 500. Where counsel's conduct was part of a strategy devised after an

investigation of the law and the facts, "the 'weak' presumption becomes a 'strong' presumption, which is 'virtually unchallengeable.'"  *Id.* (quoting *Strickland*, 466 U.S. at 690).

"[O]vercoming the strategic presumption does not, in itself, entitle the petitioner to relief. It merely gives her the opportunity to show that counsel's conduct fell below objective standards of attorney conduct."  *Id.* at 501.  In other words, the petitioner still must establish that counsel's performance was objectively unreasonable.

To satisfy the prejudice component, the petitioner must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 502 (quoting *Strickland*, 466 U.S. at 694). The prejudice standard is not "a stringent one."  *Id.* (quoting *Jacobs v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005)).   The defendant "need not show that counsel's deficient performance more likely than not altered the outcome in the case – rather, she must show only a probability sufficient to undermine confidence in the outcome."  *Id.* at 502 (citations and internal quotation marks omitted).

Eleazer faults counsel for not taking "special care to determine that [she] understood the charges . . . her defenses or . . . the plea and waiver documents she signed."[37]   As a result, according to her, her plea was "not knowing, intelligent and voluntary."[38]   She contends that she "relied on the advice of her counsel to plead guilty,

---

[37] Mem. in Supp. of § 2255 Mot. at 9.

[38] *Id.* at 10.

even though she maintained that she was actually innocent."[39]   Essentially, she is asking to withdraw her guilty plea.

Eleazer also claims that her counsel failed to conduct a reasonable pretrial investigation which would have revealed that she had been diagnosed as "retarded/educable" while in grade school.[40]   Had he done so, her attorney would have been aware that she had a limited ability to understand and to appreciate what she was doing.  She appears to claim that she was malleable in the hands of her counsel who "persuaded her to enter a plea to a crime she did not commit."[41]

Eleazer testified that defense counsel mailed her a copy of the guilty plea agreement and spent approximately twenty minutes discussing it with her.[42]   He also mailed her the presentence investigation report and spent approximately ten to fifteen minutes discussing it with her.[43]   According to Eleazer, she could not read either document.[44]

Her former counsel testified, and she did not dispute, that neither she nor anyone else informed him that she could not read.[45]   Nor did she ask counsel to explain anything in the documents because she did not understand them.  He had no reason to

---

[39] Supplemental Mem. in Supp. of § 2255 Mot. (Doc. No. 63) at 3.

[40] Mem. in Supp. of § 2255 Mot. at 9.

[41] § 2255 Mot. at 4.

[42] May 1, 2013 § 2255 Hr'g Tr. Eleazer Testimony 7:11-13; 8:4-6.

[43] *Id.* 10:17-19; 11:21-23.

[44] *Id.* 7:14-16; 10:20-25.

[45] May 1, 2013 § 2255 Hr'g Tr. Counsel Testimony 20:14-19; 21:9-10.

question that she understood everything.  He saw no evidence of mental retardation.[46]
On the contrary, she "struck [him] as a very competent individual."[47]

At the outset of her plea hearing, she was informed that if she did not understand
any question or explanation during the proceeding, she could ask to have the question
or explanation rephrased.[48]  At no time during the proceeding did she appear not to
comprehend what was being communicated.  Nor did she ask for clarification.

Eleazer was also asked whether she had ever been treated for mental illness
and whether she was feeling mentally sound.[49]  She testified that she attended Wedge
for therapy because she was anxious and depressed.[50]  She did not mention having
diminished mental capacity in high school or since then.  During the colloquy, she also
stated that she had gone to the eleventh grade.[51]  Significantly, contrary to her present
contention, she testified at the plea colloquy that she had read the plea agreement and
had gone over it with her attorney before she signed it.[52]  In fact, according to her earlier
testimony, her attorney fully explained the agreement to her and answered all her
questions about it.[53]

---

[46] *Id.* 10:25-11:12.

[47] *Id.* 11:9-10.

[48] Dec. 20, 2012 Change of Plea Hr'g Tr. 3:12-20.

[49] *Id.* 8:22-10:1.

[50] *Id.*

[51] *Id.* 8:15-16.

[52] *Id.* 11:22-24.

[53] *Id.* 12:2-10.

It is not clear why Eleazer now claims that she first became aware that she was facing a prison sentence on the eve of sentencing.  She first made such a claim in her affidavit attached to the § 2255 motion.[54]  Perhaps, she makes this assertion to bolster her claim that her former attorney, to induce her to plead, told her that she would be sentenced to probation if she pleaded guilty.

Eleazer's claims and testimony are contradicted by her statements and responses at her change of plea hearing and at sentencing, and by her attorney's credible testimony.  At her change of plea, Eleazer acknowledged that she knew that she was facing a maximum possible penalty of twenty years in prison and that no one could guarantee what sentence I was going to impose.[55]  In fact, she was advised that she could not later complain that she received a more severe sentence than she anticipated or someone told her she was likely to receive.[56]

Not only was she advised that there was no guarantee what the sentence would be, her former attorney denied ever telling her that she was going to receive probation.[57]  He testified that he would never make such a prediction to a defendant.[58]

As to her claim that she is innocent and was not guilty of conspiring to distribute oxycodone, she misapprehends the law of conspiracy.  Even if she did not personally sell or distribute any oxycodone to a third party, she is still guilty of having participated

---

[54] § 2255 Mot. Decl. ¶ 7.

[55] Dec. 20, 2012 Change of Plea Hr'g Tr. 17:1-13.

[56] *Id.* 17:7-11.

[57] May 1, 2013 § 2255 Hr'g Tr. 9:23-10:1.

[58] *Id.* 10:8-14.  Even if her former attorney had predicted that she would receive a probationary sentence, his prognostication would not amount to ineffectiveness of counsel.  *See United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007); *United States v. Jones*, 336 F.3d 245, 254 (3d Cir. 2003); *Masciola v. United States*, 469 F.2d 1057, 1059 (3d Cir. 1972) (per curiam).

in a conspiracy to do so.  The evidence outlined at the plea hearing and at sentencing established that Eleazer participated in the scheme to obtain fraudulent prescriptions from a dental office for the purpose of filling the prescriptions at a pharmacy and then distributing the oxycodone to persons other than those whose names appeared on the prescriptions.

At the change of plea hearing, the government summarized the evidence that it contended it would present at trial.[59]  The government was prepared to prove that Eleazer played a role in the conspiracy by arranging for the pick up of the phony prescriptions and having them filled at the pharmacy and then delivered to others who would sell the drugs.  With respect to Eleazer, the evidence was that Dione Johns, who worked in the dental office, contacted Eleazer when she had phony prescriptions ready to be filled.  Eleazer then contacted Thomas to get the prescriptions and have them filled.  Thomas returned to Eleazer's home with the drugs.

Eleazer agreed that what the government represented it was prepared to prove if she had gone to trial was essentially true.[60]  She did balk at the extent of her involvement.[61]  She contended that she did nothing more than use her share of the oxycodone for her own benefit.[62]  When asked whether she did what the government said she did, Eleazer stated, "Not all, no."[63]  She protested, "I didn't accept all [of] them.

---

[59] Dec. 20, 2012 Change of Plea Hr'g Tr. 26:9-29:23.

[60] *Id.* 30:10-12.

[61] *Id.* 30:13-15.

[62] *Id.* 30:18-20.

[63] *Id.* 30:13-15.

I took them for myself but a lot of stuff on here is not right that I didn't do."[64]   At that

point, to ensure that Eleazer was not pleading guilty to crimes she did not commit, I

informed her that "I'm not going to let you plead guilty to something you did not do."[65]   At

that point, Eleazer and her attorney conferred privately.   The following exchange then

took place:

> MR. MEEHAN:  Judge, if I could.  I think the point that Ms. Eleazer is
> making is that while she was involved and she is pleading guilty to the
> conspiracy, I think her point is more so to the number of times.   The
> allegations are that there were 134 prescriptions that were filled.  133
> times with a name other than Ms. Thomas's.   While Ms. Eleazer was
> involved in the conspiracy, she was not involved for the number of pills
> that the government has set out so yes, she is involved in the conspiracy.
>
> THE COURT:  What does that mean?
>
> MR. MEEHAN:  Well, it means that she was involved but not every single
> time the pills were picked up from the pharmacy using prescriptions from
> doctor – from Lionel Jones, Dr. Jones.
>
> THE COURT:  Mr. Glenn, are you following that?
>
> MR. GLENN:  I'm sorry.
>
> THE COURT: Are you following that?
>
> MR. GLENN:  Yes.
>
> THE COURT: Do you want to respond?
>
> MR. GLENN:  Yes, your Honor.
>         First, it sounds like a sentencing issue.  She agrees she was part
> of the conspiracy but may disagree as to its duration.   Our evidence,
> based on the number of telephone calls that are involved and the time
> period that those calls are involved on the statement of Ms. Thomas to us
> at the time of the search warrant are that Ms. Eleazer was involved in the
> entire matter but she is acknowledging her membership in the conspiracy
> to which she is pleading guilty.

---

[64] *Id.* 30:18-20.

[65] *Id.* 31:1-3.

THE COURT:  And that is the only count she is pleading to?

MR. GLENN:  I'm sorry.

THE COURT:  Is that the only count she is pleading to?

MR. GLENN:  That's correct, your honor.

MR. MEEHAN:  I am –

THE COURT:  In other words, you are saying you don't want to get stuck with the whole thing?

MS. ELEAZER:  Yes.

THE COURT:  All right.  But you participated in the conspiracy?

MS. ELEAZER:  Yes.

THE COURT:  And you knew what the purpose of the conspiracy was?

MS. ELEAZER:  Yes.

THE COURT:  All right.  And you did so knowingly?

MS. ELEAZER:  Yes.

THE COURT:  And intentionally?

MS. ELEAZER:  Yes.

THE COURT:  All right.  All right.[66]

At sentencing, Eleazer again challenged the government's assertion that she had distributed oxycodone.[67]  She emphatically stated that she used the oxycodone she derived from the scheme for herself.[68]

---

[66] *Id.* 31:5-33:6.

[67] *See* Mar. 20, 2013 Sentencing Hr'g Tr. 36:6.

[68] *Id.* 35:13-36:6.

Even though Eleazer may have used the oxycodone that she received during the course of the conspiracy for her own use, she still assisted in the scheme to obtain the drugs illegally.  Giving her the benefit of the doubt and accepting her argument that she used the drugs which she received for her own use does not remove her from the conspiracy.  She obtained the drugs in return for her playing a role in the scheme.  Again, merely because she used her share of the oxycodone gotten from the illegal distribution scheme for herself does not absolve her of liability as a co-conspirator.

As found at her change of plea hearing, there was a factual basis establishing the essential elements of conspiracy to distribute oxycodone.[69]  The government's proffered evidence was that two or more persons agreed to distribute oxycodone; Eleazer was one of those persons; she joined the conspiracy knowing of the objective of the conspiracy, that is, to distribute oxycodone, and intending to achieve that objective.

Eleazer does not dispute that she received oxycodone as part of the scheme involving Dione Johns and Deserie Thomas, her co-defendant.[70]  She denies that she personally distributed any oxycodone.  Instead, she contends that she used it to satisfy her own personal addiction.[71]

At the change of plea hearing, Eleazer represented that her attorney had explained "what the indictment meant, the nature of the charges, what rights [she] had with respect to going to trial[.]"[72]  When asked if she had any questions about the

---

[69] Dec. 20, 2012 Change of Plea Hr'g Tr. 34:9-12.

[70] *Id.* 32:21-33:6.

[71] *Id.* 31:19-20; Mar. 20, 2013 Sentencing Hr'g Tr. 35:13-36:6.

[72] Dec. 20, 2012 Change of Plea Hr'g Tr. 10:6-11.

charges, her rights or possible defenses, she replied that she had none.[73]   She acknowledged and her attorney confirmed that he had explained conspiracy to her.[74]

Eleazer accuses her former attorney of ineffectiveness at sentencing because he argued that she had "distributed oxycodone to a third party for cash."[75]   She asserts that "[t]his never happened. [She] was addicted to oxycodone and used the pills herself."[76]   Accordingly, she contends that the quantity that was used personally should have been deducted from the calculation of the total drug quantity for purposes of calculating the offense level.[77]

Contrary to Eleazer's claim, defense counsel did make the argument she said he had not.   He pointed out that the government had no evidence of her "actually selling or possessing the intended delivery" of the drugs.[78]   He argued that the offense level should have been reduced as a result of deducting the quantity that she had used for herself.[79]   Significantly, contrary to her claim, her sentence would not have been a probationary one or anything less than one year in jail because I had taken into account her addiction to oxycodone and that she did not personally sell any of the oxycodone that she helped obtain for distribution.   I considered her role in the conspiracy to be the middleman who arranged each rendezvous of the script writer and the messenger.   In return, she received a portion of the drugs for her own use.

---

[73] *Id.* 10:12-16.

[74] *Id.* 10:6-10:11; 25:12-22.

[75] § 2255 Mot. at 4.

[76] *Id.*

[77] Mem. in Supp. of § 2255 Mot. at 10.

[78] Mar. 20, 2013 Sentencing Hr'g Tr. 21:12-16.

[79] Def.'s Sentencing Mem. and Mot. for Downward Variance (Doc. No. 36) at 7.

The most serious claim that Eleazer makes is that her former attorney pressured her into pleading guilty despite her innocence.[80]   The attorney acknowledged that initially she had denied her involvement in the conspiracy.[81]   However, after reviewing with her the evidence that the government had produced in discovery, he advised her that he believed it likely that a jury would convict her.[82]   She ultimately decided to change her plea to guilty.[83]

No pressure was applied to get her to plead guilty.  Indeed, at her change of plea hearing, Eleazer represented that she was pleading guilty of her own free will and no one had threatened or promised her anything to get her to plead guilty.[84]   She voiced her satisfaction with her counsel's representation.[85]   Having had the opportunity to assess the credibility of Eleazer and her former attorney, I conclude that she did not protest her innocence but instead admitted she was guilty while insisting she did not want to go to trial.

Eleazer's statements made at sentencing contradict her claims of innocence. During her allocution, while insisting that she did not sell any drugs on the street and claiming that she played a part in the conspiracy to obtain drugs for her own use, she conceded that she also received money.[86]   She minimized her financial gain, saying, in

---

[80] § 2255 Mot. at 4.

[81] May 1, 2013 § 2255 Hr'g Tr. 5:9-10; 24:24-25.

[82] *Id.* 5:10-13; 44:1-11.

[83] *Id.* 6:24-7:3; 25:14-18.

[84] Dec. 20, 2012 Change of Plea Hr'g Tr. 10:21-11:3.

[85] *Id.* 10:17-20.

[86] Mar. 20, 2013 Sentencing Hr'g Tr. 35:16-36:21.

response to the question about how much money she made for her part, "Not a lot. I'm behind in all my bills."[87]

Before giving Eleazer his opinion that a jury would probably find her guilty, her attorney had reviewed the discovery produced by the government.[88] It included phone records establishing that Thomas and Eleazer had over 1,000 phone conversations between January 4 and May 2, 2012, surveillance photographs and agents' personal observations of Thomas going to and from Eleazer's home before and after filling the phony prescriptions, surveillance of the dental office, and the inculpatory statements of Eleazer and Thomas.[89] Her attorney did not persuade her to plead guilty.[90] She made the decision after he reviewed the government's evidence with her and advised her that a jury would probably find her guilty.[91] She acknowledged that she had been a part of the drug distribution scheme.[92]

Eleazer criticizes both her former attorney for failing to request discovery related to the Johns prosecution and the government for not producing it.[93] Eleazer argues that Johns' proffer is "entirely exculpatory" because Johns identified Thomas as the individual who was responsible for bringing patients to the dentist's office and then

---

[87] *Id.* 36:25-37:1.

[88] May 1, 2013 § 2255 Hr'g Tr. 4:24-5:13; 25:1-13; 44:1-11.

[89] *Id.* 22:23-23:11; Dec. 20, 2012 Change of Plea Hr'g Tr. 26:9-29:23.

[90] May 1, 2013 § 2255 Hr'g Tr. 25:4-5.

[91] *Id.* 25:1-18; 44:1-11.

[92] *Id.* 38:15-17; 43:13-19.

[93] Supplemental Mem. in Supp. of § 2255 Mot. at 9-10. Eleazer did not raise a *Brady* issue in her § 2255 motion. She made this claim after the evidentiary hearing. Nonetheless, we shall address it now.

obtaining prescriptions for them.[94]   Eleazer also argues that Johns's statements contradict Thomas's statement, which shifted culpability from Thomas to Johns and Eleazer.[95]

In her interview with a DEA agent on March 5, 2012, before Eleazer and Thomas had become targets of the investigation,[96] Johns admitted her involvement in oxycodone transactions with two individuals, not Eleazer or Thomas, in December 2011 and January 2012.[97]   At that time, Johns was not asked, nor did she volunteer any information, about Eleazer or Thomas.

In October 2012, in her proffer, Johns said that "all of the pills" she was involved in selling up to January 2012 came from a source identified as a person other than Eleazer.[98]   Johns identified Thomas as a caregiver who often brought patients to the dentist's office.[99]   She added that Thomas "never got a prescription without a patient present."[100]   Again, Johns did not volunteer any information about Deborah Eleazer.

Eleazer's attorney did not receive Johns's statement to the DEA agents and her plea agreement in the case in which she was charged with selling oxycodone to an undercover agent.[101]   Eleazer's attorney had no need for the Johns material.   He

---

[94] Fourth Supplemental Mem. in Supp. of § 2255 Mot. at 2.

[95] *Id.* at 6-7.

[96] May 1, 2013 Hr'g Tr. DEA Agent Testimony 34:13-15.

[97] Johns Mar. 5, 2012 DEA-6 ¶ 6 (filed under seal).

[98] Johns Oct. 9, 2012 DEA-6 Proffer ¶¶ 5-8 (filed under seal).

[99] *Id.* ¶ 13.

[100] *Id.* ¶ 14.

[101] May 1, 2013 § 2255 Hr'g Tr. Counsel Testimony 27:25-28:9.   Johns was charged with and pleaded guilty to distribution of oxycodone in violation of 21 U.S.C. § 841(a)(1).   *U.S. v. Johns*, 12-cr-104.

explained that Eleazer decided to plead guilty early in the process.[102]   After being confronted with the government's case against her, she admitted her participation in the charged conspiracy, which covered a period after Johns had sold drugs to undercover agents and brokered transactions with two others.[103]   Contrary to her claim, Johns's statement to the DEA did not exculpate Eleazer.   Thus, Eleazer's attorney's performance in not requesting and reviewing Johns's statements and plea agreement was not deficient.

Nor did the government violate the *Brady* rule when it did not provide Johns's statements and her plea agreement.   The *Brady* obligation is intended to ensure that a defendant gets a fair trial.   *United States v. Bagley*, 473 U.S. 667, 675 (1985); *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013); *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("There can be no violation of *Brady* unless the government's non-disclosure infringes the defendant's fair trial right.") (citing *U.S. v. Higgs*, 713 F.2d 39, 42-43 (3d Cir. 1983)).   In the context of a guilty plea, a defendant waives not only her right to a jury trial, but also the accompanying constitutional guarantees.   *Boykin v. Alabama*, 395 U.S. 238, 243 (1969).   A plea is valid despite the defendant's misapprehension of the strength or weakness of the government's case.   *United States v. Ruiz*, 536 U.S. 622, 630 (2002) (citing *Brady*, 397 U.S. at 757)).   Hence, the government has no obligation to provide impeachment material before the defendant pleads guilty.   *Ruiz*, 536 U.S. at 633 ("the Constitution does not require the Government

---

[102] *Id.* 30:14-18.

[103] *Id.* 43:13-16.

to disclose material impeachment evidence prior to entering a guilty plea agreement with a criminal defendant.").[104]

The Johns material was not *Brady* material in Eleazer's case because it was neither exculpatory nor impeachment.  The case against Johns arose out of her selling drugs out of the dental office.  She was not charged in the conspiracy charged in Eleazer's case.  Johns was charged and pleaded guilty to selling oxycodone to an undercover agent.  Nothing in her statements to the DEA agents inculpated or exculpated Eleazer.  Thus, the statements would not have contradicted the government's evidence in the conspiracy case against Eleazer.

As Eleazer's former attorney correctly testified, the failure to produce the Johns information would have been *Brady* material had Eleazer gone to trial; but, it was not at the plea stage.[105]  Moreover, the government was not required to turn over information she could have obtained herself.  *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005) (citation omitted).  Johns was Eleazer's brother's girlfriend and was available to her.

Eleazer also contends that the government should have produced Thomas' proffer because it would have shown that she was not truthful when she minimized her involvement in picking up the prescriptions.[106]  Yet, she acknowledges that she does not

---

[104] *Ruiz* applied in the context of material impeachment evidence only.  In the Third Circuit, it is an open question whether *Brady* requires disclosure of exculpatory information prior to the entry of a guilty plea to an indictment. *United States v. Brown*, 250 F.3d 811, 816 n. 1 (3d Cir. 2001). *Compare United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) and *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995) (holding that *Brady* applies when a defendant enters a guilty plea to an indictment*) with Unites States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009) (finding no *Brady* obligations before post-indictment guilty plea).

[105] May 1, 2013 § 2255 Hr'g Tr. Counsel Testimony 30:9-13.

[106] Third Supplemental Mem. in Supp. of § 2255 Mot. (Doc. No. 66) at 4-5.

know whether Thomas could have been impeached if the government had called her as a witness.[107]   Even assuming the statement was impeachment material, the government was not required to produce it once Eleazer decided to plead guilty.   The Supreme Court has explicitly ruled that the government has no constitutional obligation to disclose impeachment material prior to a guilty plea.   *Ruiz*, 536 U.S. at 628-33.   As the Court noted, "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* ("knowing," "intelligent," and "sufficient[ly] aware")."   *Id.* at 629 (emphases in original).

Thomas' proffer does not contain exculpatory information.   It portrays Eleazer as the moving force behind the conspiracy.   It describes Eleazer's role in arranging transportation, pick-ups and payment for Thomas's services.[108]   Thomas stated that Eleazer arranged transportation of individuals to the dentist's office and that she paid Thomas up to $60 a day in cash.[109]   She indicated that on some occasions she delivered the pills directly to Eleazer, and, on other days, Eleazer obtained the pills from the individuals directly.[110]   According to Thomas, she got the prescriptions either from Eleazer herself or from the dentist's office.[111]   Those statements would prove that Eleazer was actively involved in the conspiracy.

Eleazer contends that Thomas' statement would have been exculpatory "because at paragraph 6 she stated that she had 'no knowledge of what Eleazer did

---

[107] *Id.* at 8.

[108] Thomas Dec. 6, 2012 DEA-6 Proffer ¶ 3 (filed under seal).

[109] *Id.*

[110] *Id.*

[111] *Id.* ¶ 6.

with the Oxycodone pills. . .'  The charge against Eleazer is possession with intention to distribute oxycodone.  Thomas provided no evidence of Eleazer's intention to distribute the oxycodone."[112]  Significantly, the charge against Eleazer was not mere possession with intent to distribute, but conspiracy to distribute oxycodone.  Nothing in the statement removes Eleazer from that conspiracy.

Thomas' statement regarding her lack of knowledge of what Eleazer did with the pills is immaterial.  It does not suggest that Eleazer did not distribute the pills.  As the government points out, Eleazer "had to distribute the pills to someone because Thomas said that she delivered all the pills to Eleazer" and the number of pills delivered to her were more than she could have consumed during the four-month period of the conspiracy.[113]

At the evidentiary hearing, the DEA agent testified that he observed Thomas picking up prescriptions and bringing them to Eleazer's house several times.[114]  On May 2, 2012, at approximately 1:00 p.m., the agent saw Thomas deliver the pills to Eleazer's house.[115]  Four hours later, when the agents searched the house, the 200 pills which Thomas had delivered were gone.[116]  He also testified that Eleazer confessed to being involved in the conspiracy and described in detail how the scheme worked.[117]

---

[112] Third Supplemental Mem. in Supp. of § 2255 Mot. at 5.

[113] U.S. Resp. to Def.'s Mot. for Discovery and to Set Aside Sentence at 16.

[114] May 1, 2013 Hr'g Tr. DEA Agent Testimony 36:12-15; 37:1-8.

[115] *Id.* 37:12-17.

[116] *Id.* 38:8-13; 39:7-10.

[117] *Id.* 46:11-47:7.

Eleazer has not demonstrated the materiality of the information she claims was improperly withheld.  Information is material when "there is reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  Although a defendant asserting a *Brady* violation need not prove that disclosure would have resulted in an acquittal, she must show that there was a "reasonable probability" of a different result.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

What Eleazer argues was improperly withheld is not evidence that would give rise to a reasonable probability of a different outcome.  It does not undermine confidence in the outcome of the proceeding.

Eleazer insisted that she did not want to go to trial.  She admitted her criminal involvement to her former attorney and to the court, both at her guilty plea and sentencing.  The evidence she claims her attorney did not review and the government did not produce would not have resulted in a different outcome favorable to her.  Nor does it undermine confidence in the result.

### Conclusion

Having considered Eleazer's claims and having had the opportunity to assess her credibility, I conclude her claims have no merit.  Therefore, I shall deny her § 2255 motion.